## THE BERMUDA.

1. No trade honestly carried on between neutral ports, whether of the same or of different nations, can be lawfully interrupted by belligerents; but good faith must preside over such commerce: enemy commerce under neutral·disguises has no claim to neutral immunity.

2. Neutrals may establish themselves, for the purposes of trade, in ports convenient to either belligerent; and may sell or transport to either such articles as either may wish to buy, subject to risks of capture for violation of blockade or for the conveyance of contraband to belligerent ports.

3. Goods of every description may be conveyed to neutral ports from neutral ports, if intended for actual discharge at a neutral port, and to be brought into the common stock of merchandise of such port; but voyages from neutral ports intended for belligerent ports are not protected in respect to seizure, either of ship or cargo, by an intention, real or pretended, to touch at intermediate neutral ports.

4. Neutrals may convey to belligerent ports, not under blockade, whatever belligerents may desire to take, except contraband of war, which is

always subject to seizure when being conveyed to a belligerent destination, whether the voyage be direct or indirect; such seizure, however, is restricted to actual contraband, and does not extend to the ship or other cargo, except in cases of fraud or bad faith on the part of the owners, or of the master with the sanction of the owners.

5. Vessels conveying contraband cargo to belligerent ports not under blockade, under circumstances of fraud or bad faith, or cargo of any description to belligerent ports under blockade, are liable to seizure and condemnation from the commencement to the end of the voyage.

6. A voyage from a neutral to a belligerent port is one and the same voyage, whether the destination be ulterior or direct, and whether with or without the interposition of one or more intermediate ports; and whether to be performed by one vessel or several employed in the same transaction and in the accomplishment of the same purpose.

7. Destination alone justifies seizure and condemnation of ship and cargo in voyage to ports under blockade; and such destination justifies equally seizure of contraband in voyage to ports not under blockade; but, in the last case, ship and cargo not contraband are free from seizure, except in cases of fraud or bad faith.

8. Circumstances, such as selection of master, control in lading and destination, instructions for conduct of voyage, and other like acts of ownership by an enemy, may *repel*, in the absence of charter-party or other explanation, presumptions of ownership in a neutral arising from registry or other documents, and will warrant condemnation of a ship captured in the employment of enemies as enemy property.

9. Spoliation of papers, at the time of capture, under instructions and without explanation by production of the instructions, or otherwise, warrants the most unfavorable inferences as to employment, destination, and ownership of the captured vessel.

APPEAL from a decree made by the District Court for the Eastern District of Pennsylvania, regarding the steamship Bermuda and her cargo, captured during the rebellion by the government war-vessel Mercedita, and sent into Philadelphia, and libelled there and proceeded on in prize.

The allegations of the captors were, that the vessel was enemy's property, and with her cargo—largely composed of munitions of war—had been intending, either directly or by transshipment, to break the blockade, then established by our government, of the southern coast, and that both she and her cargo were, on these and other grounds, subject to be captured and condemned.

The case was interesting, partly from the value, larger than common, of the ship and cargo, but more particularly

from the fact, that while many and strong indications of a general sort pointed at once to the truth of the allegations of the captors, blockade-running had been brought, by our adventurous English kinsfolk, during the Southern rebellion, to so much of a science; true purposes, by the aid of intermediate neutral ports of their own, had come to be so very well disguised; the final general destination of the cargo in this particular voyage was left so skilfully open, and the capture was so confessedly in neutral neighborhoods, that it was not quite easy to prove, with that certainty which American courts require, the intention, which it seemed plain must have really existed. Thus to prove it, required that truth should be collated from a variety of sources, darkened or disguised; from others opened as the cause advanced, and by accident only; from coincidences undesigned, and facts that were circumstantial. Collocations and comparisons, in short, brought largely their collective force in aid of evidences that were more direct.

The history of things, as they appeared on one side and on the other respectively, was in substance thus:

*On the captor's side.* The vessel herself had been built at Stockton-upon-Tees, in 1861. In August of that year, a certain Edwin Haigh made the declaration of ownership required by the British Merchants' Shipping Act of 1854. He described himself as a "natural born British subject," of Liverpool, "and *entitled to be registered* as owner;" swearing, according to the usual form, that no other person "*qualified* to be owner of *British* ships is entitled as owner to any interest whatever."* E. L. Tessier, a South Carolinian,

---

* It was, perhaps, a noteworthy fact that, in most of the affidavits, &c., about the ownership, the language was of a sort that did not necessarily involve an unqualified assertion of real and equitable ownership, as distinguished from the legal title and ownership on the registry, which the British statutes, like our own, largely look to. One of the documents, for example, said: "Your memorialist is a British subject and sole *registered* owner" of the ship Bermuda, &c. In another, Mr. Haigh styles himself, "shipowner and merchant." In another, he thought that certain contraband things found on board should not affect his position "*as* owner of the vessel," &c. &c.

was stated to be master of the ship. It was not denied that Haigh was a British subject. On the day after her registry, as appeared by a document from the Liverpool customs, entitled, " Certified Copy, Transaction subsequent to regis-try," Haigh executed a power of attorney, or " certificate," as it was called, to Allan Stuart Hencle and George Alfred Trenholm, both *of Charleston, South Carolina*, merchants, "jointly or severally to sell the ship, at any place out of the kingdom, for *any sum he or they may deem sufficient*, within *twelve months* from the date of the certificate." There was no evidence that this power had ever been revoked or returned.

Trenholm was a member of the firm of Frazer, Trenholm & Co., of Liverpool, a firm which, with its branch house, John Frazer & Co., of Charleston, was one of the firms most largely engaged in rendering aid to and sustaining the re-bellion, by fitting out blockade-runners, and corsairs to in-jure American commerce. They were also the disbursing agents of the rebel confederation in England, and they had several vessels, the Ella, Helen, Herald, Economist, Albert, and others, forming a sort of " line" between Liverpool and Charleston, which carried on blockade-running, with the aid of agents at Bermuda and Nassau, N. P., intermediate British neutral isles. The firm was composed of Frazer & Trenholm, as also of a certain Prioleau, one Welsman, and a *J. R. Armstrong;* the first four being South Carolinians; and the last, alone, a British subject.

In possession of the registry and power of sale already mentioned, the Bermuda sailed for Charleston, then a port in rebellion and under blockade, in August, 1861. For some reason not stated, and inferable only, she ran into Savannah instead—a port also in rebellion and under block-ade—running out again and back to Liverpool in the autumn of that year. Her master was now changed. Captain Tes-sier was transferred to the Bahama, which afterwards be-came notorious in the United States as having carried armament to the rebel corsair Alabama, sunk off the coast of Normandy by the United States ship of war Kearsarge. A certain Westendorff was put on the Bermuda. The British

statutes, however, requiring a recommendation to authorize
a license to any one as captain, *Frazer, Trenholm & Co.*, in
December, 1861, declared that they had known Westendorff
for ten years; that he served under an experienced ship-
master, sailing out of *Charleston*, and that he had afterwards
commanded one of *their* ships. Among these was the Helen,
a blockade-runner. Westendorff was, accordingly, legally
licensed by the British merchant authorities captain of the
Bermuda.

By the practice of the British ports, it is usual to indorse
the address of the captain licensed on the back of his certi-
ficate of license. This indorsement on Captain Westendorff's
ran thus:

"*Address of bearer:* Messrs. Frazer, Trenholm & Ço., Liver-
pool."

Being brought round from West Hartlepool, on the east
coast of England, the Bermuda now prepared for another
voyage. Ostensibly it was to Bermuda. The cargo con-
sisted of various things, some of which would have been
useful enough at Bermuda, but which—cut off as the place
had been by the blockade from commerce—were supremely
desired at Charleston; such as tea, coffee, drugs, surgical
instruments, shoes, boots, leather, saddlery, &c. Among the
dry-goods were five cases of lawns, each having a card upon
it, representing a youth gallantly mounting a parapet, and
bearing onward the "FLAG OF THE CONFEDERATE STATES,"
which in all its colors was spread to the breeze.

There were found, also, several cases of military decora-
tions, &c.; epaulettes for all grades; stars for the shoulder-
straps of officers of rank; bugles, crossed swords and can-
nons for different sorts of cap fronts; swords for staff and
line officers; *chapeaux de bras;* embroidered wreaths, "with-
out U. S. on;"* various sizes of military buttons for coats
and vests; some with the palmetto tree; belts with the
same designations; other buttons and belts with the letters
S. C.; L.;† T.;‡ &c., and with eagles surrounded by *eleven*

---

* So labelled.          Louisiana?          ‡ Texas, or Tennessee?

stars; palmetto trees embroidered on blue cloth, &c.; sash buckles, with the arms of Georgia, of South Carolina, &c.

Among the cargo were several cases of cutlery, which was stamped as

"Manufactured expressly for John Treanor & Nephew, Savannah, Ga."

It embraced a variety of articles, stamped with portraits and legends, thus:

"JEFF. DAVIS,

OUR FIRST PRESIDENT.

The right man in the right place."

Others presented a military figure, emblazoned

"GENERAL BEAUREGARD.

He lives to conquer."

Others represented a bull running after a man, with soldiers chasing; and over the bull this motto:

"ON TO WASHINGTON!  BULL RUN."

The blades of these were stamped,

"Courtney & Tenant, Charleston, S. C."

Several cases of double-barrelled guns were found, stamped as

"Manufactured for J. E. Adger, of Charleston."

There was also a large amount of munitions of war; five finished Blakely cannon in cases, with carriages; six cannon —some cast, some wrought—not in cases; some thousand shells, varying from seven to a hundred and twelve pounds each, and fuses for them.  Three hundred barrels, seventy-eight half-barrels, and two hundred and eighty-three quarter-barrels of gunpowder, seven hundred bags of saltpetre; seventy-two thousand cartridges, two and a half million percussion caps, two cases of Enfield rifles, twenty-one cases of swords, marked N. D. (navy department?), seven cases of pistols, and a variety of like or accessory things; in all about eighty tons weight.  In addition to these was a large amount of army blankets, army cloths, kerseys, vulcanized cloth, with fifteen hundred yards of adhesive plaster; these last large enough to be invoiced at $62,500.

Numerous letters of friendship and business were found

in the vessel from people abroad to different persons in the rebel States, Mrs. Trapman, Mrs. Trenholm, Mrs. Rose, Mr. T. M. Hencle, Mr. C. F. Hencle, Mr. John Hencle, &c.; also five numbers of the Times, sent by some person in England to his friend in the South; also a book by one Spence, published by Richard Bentley, New Burlington Street, London, showing the bad effects which the American Union had had on the national character and policy, and that "secession" was "a constitutional right;" several passages being marked *in margine*, apparently as if to invite attention specially to them.

A few memoranda, also, were found aboard;—requests apparently from persons in Charleston to Captain Westendorff to buy things for them in England, and bring them through the blockade. A part of one may serve for illustration;—it having been evidently by some lady.

MEMORANDUM.

"CHARLESTON, 18

| | | | | | |
|---|---|---|---|---|---|
| 2 pair ladies' kid gloves, silver-gray color. | | | | | ⎫ |
| 2 " " " tea color. | | | | | ⎬ Best quality. |
| 2 " " " ashes of rose, light and dark. | | | | | ⎭ Size 6¾. |

2 " " gaiters, *best kid*, stout soles, *soft* upper, 3½ full.
1 ladies' parasol, best silk, color drab or ashes of rose.
¼ pound black sewing silk, fine. If it can be had of mixed colors, get ½ pound of best qualities.
1 pair lady's scissors, ordinary size, and some needles of best make.                                   M. S. D.
    *Get the best quality of everything."*

One of the memoranda, which like the other was a lady's, and contained an order for gloves,—" dark-colored kid"—concludes:

" May God bless Captain W., and protect him, and bring him in safety back to his family, church, and friends, is our prayer for him."

On the vessel were several persons, called in various let-

ters "government passengers;" being in fact "artists" sent from Scotland. An account of them was given in certain letters found on the vessel: some addressed to a certain Mr. Morris, "*lithographer*," in Charleston, who it appears had safely ran the blockade not long before. In different parts they ran thus:

STATIONERY DEPARTMENT,
80 BISHOPSGATE WITHIN, 26 LEADENHALL STREET,
LONDON, February 12, 1862.

DEAR MORRIS:

I was very much pleased to hear that you managed to escape the vigilance of the Yankee vessels in getting into Charleston, and from the accounts I have heard, should think you had a *very narrow escape*.

A commissioner (Major Ficklin) from the Confederate government has been over here, and has sent a lot of printers and engravers, and presses, and paraphernalia complete, which he obtained from Scotland. He served me very shabbily and ungentlemanlike. I had many interviews with him, and gave him all necessary information; furnished him with a list of requirements, compromising myself with several workmen, and put myself to many inconveniences. He admitted my price being proper and correct, and led me to believe he would give me his order, but *having got out of me all he could*, he then intrusted the order with another house. I hardly think that fair, after promising to trust me with it and within a few weeks of its execution.

*We, in England*, do not think the North can hold on much longer, the financial state being such as to induce us to hope that two or three months will settle your present deplorable state.

We inclose our catalogue, which may guide you; and we make and can buy paper of all kinds as well as any London house; so could execute your order for foolscap loan paper, with watermark C. S. A., as shipped you, at 42*s.* per ream double, equalling two reams single.

Trusting soon to hear of you, I am yours,

C. STRAKER.

This "lot of printers and engravers" which Major Ficklin had obtained in Scotland, embarked, under the charge of one George Dunn, on the Bermuda, on this voyage, the whole

party being entered on the crew list as common sailors. They appeared to have taken their "paraphernalia complete" with them. There were at least 26 boxes marked P. O. D. (post-office department?), with immense numbers of "Confederate States" postage stamps; "printing ink for postage stamps;" copper-plates with 400 dies for printing at each impression 400 rebel postage stamps; also 200,000 letter envelopes; some "American-shape," "official blue," &c.; many reams of fine white bank-note paper, watermarked

## C. S. A.

intended obviously for "Confederate States" bank notes or bonds—"foolscap-loan-paper;" and the same apparently which is referred to and so styled in the concluding paragraph of the letter of Mr. C. Straker, of London, to his friend and correspondent Morris, quoted on the preceding page, "as shipped you at 42s. per ream double, equalling two reams single." All this stationery having gone with the captured vessel to the port of Philadelphia, was there sold.

So among the persons that embarked on the Bermuda, at Liverpool, were certain gentlemen, residents of Charleston, but perfectly well known in circles of gentility, both North and South, before the rebellion began. Among these, as was specially noted by the counsel of the captors, was the late amiable Mr. John Julius Pringle, a well-known gentleman of education and fortune, resident in South Carolina during the winter, but at Newport, Rhode Island, in summer. Mr. Pringle, with his two sons, Mr. Joel Poinsett Pringle and Mr. John Julius Pringle, Jr., with Mr. Arthur Huger, all of whom the rebellion found in Europe, and whose unquestionable wish and purpose was to return to the South, were entered on the shipping list as common sailors, and by disguised names. The nature of a shipping list and some of the regulations under which as ordinary seamen [O. S.] these gentlemen came, appear by presenting original instruments themselves. The gentlemen's names on the list are in italics.

Statement of the case: Captors' side.

## AGREEMENT FOR FOREIGN-GOING SHIPS.

| Name of Ship. | Official Number. | Name of Master. | Date of Agreement. |
|---|---|---|---|
| Bermuda. | 42,608 | C. W. Westendorff. | 22 February, 1862. |

| Signature of Crew. | Age. | Where born. | Ship in which he last served. | In what capacity engaged. | Time at which he is to be on board. | Amount of wages per calendar month, share, or voyage. | Shipping master's signature or initials. |
|---|---|---|---|---|---|---|---|
| John Dempsey, | 15 | Dublin, | Demetrius, London, | Boy, | 25 Feb. | 1 0 0 | T. Cushman |
| Thomas Willott, | 16 | Liverpool, | Holyhead, Bath, | Asst cook, | 25 Feb. | 1 10 0 | T. C. |
| Peter Johsen, | 22 | Copenhagen, | Northern Crown, | A. B., | 25 Feb. | 2 10 0 | T. C. |
| John Richardson, | 25 | Derham, | Bermuda, Liverpool, | Fireman, | 25 Feb. | 4 0 0 | T. C. |
| Wm. Geo. Embleton, | 29 | Richmond, | First Voyage, | O. S., | 25 Feb. | 0 10 0 | T. C. |
| John Isard, | 52 | Charleston, | First Voyage, | O. S., | 26 Feb. | 0 1 0 | T. C. |
| John Julius, | 19 | Charleston, | First Voyage, | O. S., | 26 Feb. | 0 1 0 | T. C. |
| Joel Poinsett, | 18 | Georgetown, | First Voyage, | O. S., | 26 Feb. | 0 1 0 | T. C. |
| Henry Arthur, | 19 | Savannah, | First Voyage, | O. S., | 26 Feb. | 0 1 0 | T. C. |
| &c., &c., | &c., | &c., &c., | &c., | | &c., | &c., | &c. |

### REGULATIONS FOR MAINTAINING DISCIPLINE,

*Sanctioned by the Board of Trade, in pursuance of the Merchants' Shipping Act, 17 & 18 Vict. c. 104.*

| No. | OFFENCE. | Amount of fine or punishment. | Shipping master's signature or initials. |
|---|---|---|---|
| 1 | Quarrelling, or provoking to quarrel, . | One day's pay. | |
| 2 | Swearing, or using improper language, | One day's pay. | |
| 3 | Carrying a sheath-knife, . . . . . . | One day's pay. | |
| 4 | Drunkenness. First offence, . . . . . | Two days' half allowance provisions. | T. CUSHMAN. |
| 5 | " Second offence, . | Two days' pay. | |
| 6 | Not attending divine service on Sunday, unless prevented by sickness or duty of the ship, . . . . . . . . . . . . | One day's pay. | |
| 7 | Interrupting divine service by indecorous conduct, . . . . . . . . . . . | One day's pay. | |
| 8 | Not being cleaned, shaved, and washed on Sundays, . . . . . . . . . . . . | One day's pay. | All adopted. |
| 9 | Washing clothes on a Sunday, . . . . | One day's pay. | |
| 10 | Secreting contraband goods on board, with intent to smuggle, . . . . . . . . | One month's pay. | |

Of the ship's real company, the master, Westendorff, the first mate, and the master's brother (calling himself and shipped as a hand, but acting as clerk) and three seamen, were citizens of South Carolina; and the second mate, the carpenter, and cook belonged to other States in rebellion.

There were forty-five bills of lading, of which thirty-one were for goods shipped by Fraser, Trenholm & Co. The whole of the cargo was shipped under their direction; and according to the bills of lading it was to be delivered at Bermuda, "*unto order or assigns.*" No consignees were named on the bills.

Several of the persons connected with the ship or otherwise, and who were examined *in preparatorio*, appeared to regard her as owned by Fraser, Trenholm & Co. Thus the chief engineer, when thus asked to whom she belonged, answered: "To the best of my knowledge, Fraser, Trenholm & Co. are the owners." Heenan, a fireman, said: "I have understood that Fraser, Trenholm & Co. are the owners." Noble, another fireman: "The owners of the captured vessel, to the best of my knowledge and belief, are Fraser, Trenholm & Co." And Pierson, a third one, said:

Statement of the case: Captors' side.

"At Liverpool, it was the common talk that Fraser, Tren-
holm & Co., of Liverpool, owned the captured vessel." A
letter of one of the mates, found on board and written to
some friend,* seemed to speak of them in the same way.
So, too, Tessier, the old captain, writes to Westendorff, his
successor, thus:

STOCKTON-ON-TEES, 20th Feb., 1862.
DEAR WESTENDORFF:

Will you do me a favor? Opposite the Brumley Moore Dock
wall there is a boot-maker of the name of Warner. As you are
passing by, will you have the kindness to step in and inquire
whether a pair of sea-boots I ordered have been sent to the
office of *our owners*. If they have, please request Mr. Griffiths,
head-porter of *Frazer, Trenholm & Co.*, to forward them to me.

Captain Mitchell must have had a trying time since he sailed.
I hope he kept her well to the southward after leaving the
channel. To take the H. [erald?] across the Atlantic, at this
season, will require some working.

With sincerest regards, I remain ever yours respectfully,
E. L. TESSIER.

Certain *correspondence* between Fraser, Trenholm & Co.
and their branch house, &c., was specially relied on by the
captors to show that the British subject Haigh was not the
owner, and that the firm of Fraser, Trenholm & Co. was.
Thus it appeared that, on the 16th of January, 1862, the
Liverpool house of Fraser, Trenholm & Co. write to the
Charleston branch, John Fraser & Co., that they had des-
patched the ship "Ella" with a cargo to Butterfield, Ber-
muda, and that she would be followed by the steamer Ber-
muda with goods.

They now write as follows:

["Ella."]
LIVERPOOL, 23d January, 1862.
MESSRS. JNO. FRASER & CO., Charleston.

DEAR FRIENDS: Referring to our respects of 16th inst., we now
hand inclosed bills lading of the cargo per ship Ella, and copies
of invoices.

---

* See *infra*, p. 528. " *I have seen the owners.* All fudge what he told me.
*Mr. Preleau (principal man) came up to me,"* &c.

These goods are all shipped by our friends here; *but the disposition of them there is left entirely to you, and in any market to which you may please to direct them.*

The bills of lading are indorsed to your order, or that of your authorized agent. Captain Carter is an intelligent shipmaster, and we believe a good man of business; any communication for him, if you do not find it expedient to send an agent to Bermuda, should be sent under cover to Mr. N. T. Butterfield, Hamilton, Bermuda. Captain Carter is instructed to proceed to Bermuda, and there await your instructions. The ship is now in the river ready for sea.

The "Albert" sailed yesterday for Nassau, and will proceed, after landing her cargo, to Rio for a cargo of coffee, with which she is to return to Nassau *for orders.*

We remain yours, very truly,

FRASER, TRENHOLM & CO.

["Bermuda."]

LIVERPOOL, 28th February, 1862.

MESSRS. JNO. FRASER & CO.,
        (or their authorized agent,)
                Hamilton, Bermuda.

DEAR SIRS: The letters we have written by this opportunity, with invoices and bills of lading of the cargo of the ship, are very full in every particular, and we think will greatly facilitate the delivery *and also the transshipment,* should this be determined upon. *We think that care should be taken to prevent the loss of any of the invoices or bills of lading;* but should this *unfortunately* happen, duplicates can be furnished hereafter, which would, however, involve much delay and great inconvenience in the delivery of the goods; and without the invoices there would necessarily be much embarrassment in effecting sales.

In case of there being an opportunity of sending the letters forward with the invoices and bills of lading, *we cannot too strongly impress upon you the adoption of the most certain means of preventing any of them falling into improper hands.*

Yours, truly,

FRASER, TRENHOLM & CO.

On the 1st of April, 1862, the Charleston house write to Butterfield thus, having by previous letter informed him of

their being advised that the Ella was despatched, and that she would be *followed by the Bermuda.*

CHARLESTON, April 1, 1862.

DEAR SIR :

We suppose that the steamer Bermuda may be with you ere this; and the ship Ella.

We will thank you to request the masters to act as follows, viz. :

Captain Westendorff to take in the tea and other light articles per Ella (if he has room for them), and proceed to Nassau, reporting himself, on arrival there, to Messrs. Hy. Adderly & Co.

Captain Carter to keep in his cargo and wait further orders from us.  They will reach him, we think, very shortly.

Yours respectfully,

JNO. FRASER & Co.

N. T. BUTTERFIELD, Esq.,
Hamilton, Bermuda.

Butterfield, who received this letter nineteen days after it was written, immediately sent it to Captain Westendorff, at St. George's.  Westendorff acted on it at once.  He took the new articles aboard, and the artists having got out from his ship—though he refused, as involving him in too great a responsibility in the face of his new orders, to deliver to Dunn the printing-presses and working apparatus consigned with the party under him to Bermuda—he proceeded from St. George's towards Nassau, on the 23d of April.  Mr. Pringle and the other South Carolina gentlemen were aboard.  On the 27th the vessel was captured.  He had arrived at Bermuda on the 19th March, and was accordingly there about five weeks.  His cargo was not touched while there.

Among the papers taken on board the Bermuda was an unfinished letter, without signature, and apparently written by an engineer of the Bermuda to a friend (another engineer it was said) at Stockton-upon-Tees.  It ran thus:

LIVERPOOL, WELLINGTON DOCK, February 16, 1862.

MR. A. GRAY, Stockton-on-Tees :

We are all the talk of Liverpool at present, taking in those large rifled cannon (without cases), and large lots of ammunition

and materials of war.   In American circles our fate is discussed pretty freely; they have us taken, imprisoned, and hung already. Our Hartlepool friend, Mr. Detective Maguire,* has got a job *here* again; is regularly to be seen on the quay, to take a look of what is going on board.   They put the custom-house inspec; tors to a great deal of trouble, because they are coming down every day, opening boxes and cases—to satisfy J——.   The inspector said to me yesterday, that there existed great jealousy on account of our cargo; but fortunately they cannot stop us. We are on a lawful voyage; people won't believe it here; they are bound to think we are for running the blockade again.

*Our tender* left yesterday; *don't be at all surprised we have got a tender;* they bought a light draft-boat at Dublin, used to run the mail once, called the Herald; length, 280 feet; deep water line, 10 feet; light, 5½; side-width, 225; horse, nominal, used to press up to 28 pounds; got her boilers stayed, strengthened, and soforth; strains up to 20 pounds now; average speed, 18½ knots per hour; razeed all her lower cabins, to make cargo space; shipped crew for twelve months, for some port or ports south of Mason and Dixon's line.   Three captains on board; one an Englishman, nominal; another, an experienced coast pilot from the Potomac to Charleston; another, ditto, ditto, from Charleston to the San Juan River in Texas.   If the Yankees reach her, they are smarter than I give them credit for.   *She awaits our arrival in Bermuda;* goes *first into Charleston*, though, *to see about the stone fleet.*   Don't tell Tessier I gave you the information; he'll write straight to the owners, and tell them I am a traitor, and blabber out secrets; I know him.   I have seen the owners; all fudge what he told me.   Mr. Preleau (principal man) came up to me; shook hands; said was glad to see me.   I said, I hope I didn't incur your displeasure by remaining in the Bermuda. *Answer.* Not at all.

The record showed that, after his arrival at Bermuda, Mitchell, captain of the Herald, drew a bill on Fraser, Trenholm & Co., at Liverpool, in favor of Westendorff, captain

---

* This was obviously a person employed by the United States, to see what vessels were engaged in giving aid to the rebellion. He had been watching, it appears, the vessel before she was brought round to Liverpool. —REP.

of the Bermuda, for £258, to be charged to the account of the Herald; showing that Captain Westendorff advanced to the Herald that amount.

So to one Farrelly, a person on the Bermuda, and apparently a candid, though not a much educated witness, testified:

"At Bermuda there was a steamer called the Herald, which we understood was intended to run the blockade; but the captain who brought the steamer out from England refused to run it. The talk at Bermuda was that there were other captains on board the Herald, and that they were trying to get one of these captains in command. It was also the talk that the Herald was connected with our ship."

At the time of the capture, and after the vessel was boarded, the captain's brother, by his order, threw overboard two small boxes and a package, which he swore that he understood contained postage-stamps, and a bag, which he understood contained letters, *and which he was instructed to destroy in case of capture.* Mr. Huger also destroyed a number of letters, which he swore were private letters, intrusted to him by Americans in Europe.

Such essentially was the case on the captors' side.

On the other side the case existed thus:

*As to the place where the vessel was captured.*—When captured, the Bermuda was not far from the eastern coast of Great Abaco Island, an English colony, and steering along the coast, *not* in the route to any of *our* ports, but in a southwestwardly direction, and, as was *alleged,* between Abaco and Eleuthera (another English island), to New Providence (Nassau), a third English colony. She was captured within sight of British land, within the range of the Abaco light. The distance was from five to seven miles from the shore; exactly how far was not sufficiently shown. The British flag was flying at the time of the capture, and was not hauled down until the prize was taken a distance of twenty or thirty miles further out to sea. There was, perhaps, but slight evidence,

certainly slight *direct* evidence, to show that her *immediate* destination was to any blockaded port. Being on the eastern side of the Bahama group, she was, in a straight line, as was *said at the bar*, 160 miles from Florida, 410 miles from Savannah, 430 miles from Charleston, and 480 miles from Wilmington, N. C. The Mercedita was cruising near the Abaco entrance to Nassau; and it was asserted, and perhaps rather made to appear, that orders had at one time been given, or rather, maybe, understood to be given, to capture the Bermuda *wherever found* on the high seas between England and the United States. A previous conclusion, derived from our agents in England and from trustworthy evidence, quietly collected by orders of our government, had possibly existed on the part of the government that the vessel was built for the very purpose of running the blockade.*

*As to ownership.*—Haigh, who had been desirous to make the British government interpose, as for a capture within neutral territory, and who had made claim in the court below as owner, in a paper prepared by him to induce the British government to interfere, swore that *he* was "the sole registered owner" of the vessel; that she was bound to Bermuda, with instructions to deliver her cargo there to one N. T. Butterfield, and to ship a homeward cargo for Great Britain; that it was "*not* intended that she should attempt to break the blockade," &c.; that, on the arrival of the ship at Bermuda, the consignee of the cargo was desirous that it should be carried to Nassau, and made an arrangement with the master to have it carried with some additional cargo, the particulars of which he, Haigh, had not been informed of.

So Captain Westendorff, in previously asking to make claim to the vessel and cargo for the parties whom he asserted were interested, swore that Haigh was "the true, lawful, and *bona fide* owner" of the vessel, and that no other person was owner of or *interested* in her; and that the vessel had no destination either for herself or cargo when she left Liverpool, except for Bermuda in the first instance, and ulti-

* See *supra*, p. 528.

mately for Nassau; that he, the captain, was directed to receive instructions and place himself under the care of N. T. Butterfield, of Hamilton, in the island of Bermuda named;* that the cargo was shipped and owned by British subjects and on British account, and not for or on account of or for the use of any person in the insurrectionary States; and that, if restored, it would belong to British subjects, and not to them; and that neither vessel nor cargo, nor any part of it, was intended for the insurgents; and that the vessel did not intend to violate the blockade anywhere. *His affidavit was as direct and full as possible.*

So Armstrong, the British partner in the firm of Trenholm, Fraser & Co., by writing filed, swore that "the said firm, acting as agents for Mr. Edwin Haigh, owner of the British ship Bermuda, procured for her from various shippers a full cargo;" that the steamer sailed hence for Bermuda; that the cargo laden here was intended to be discharged at Bermuda or Nassau; and that a return cargo had been provided by her consignees at Nassau; that the general management of the steamer had been placed in the hands of his firm "by the owner," but that no charter-party was entered into, "this not being customary under such circumstances."

*As to intent to run the blockade.*—In addition to what was above sworn, Harris, a member of the firm of Adderly & Co., in Nassau (the correspondents of Fraser, Trenholm & Co.), declared, on oath, that when the Bermuda was consigned to them from the island of Bermuda, the instructions then given to them were, that, on the arrival of the ship at Nassau, the cargo laden on her should be *landed,* and the ship again laden with a cargo to be delivered at some *port in Europe;* and he swore "that it was the intention of the firm of Adderly & Co. to carry out *strictly* these instructions, and that there was never any intention that the ship should run the blockade of any of the southern ports of America; but

---

* See, however, the letter of instructions, *infra*, p. 585.

that the vessel, at the time when she was taken and cap-
tured, was, so far as the instructions of the firm went, in the
*bona fide* prosecution of a voyage from the island of Bermuda
to *these islands*, with a cargo which was to be delivered *here.*"

*As respected the power of attorney*, or "certificate," to sell,
Haigh, in a letter, "*per J. R. A.*," to his agent at Philadel-
phia, represented, by way of explanation, that "it was given
on the *first* voyage of the Bermuda, as would be seen by
the date, and was intended to apply to *that only.*" "On the
vessel's return," he adds, "I endeavored to sell her, but could
neither do this nor cancel the power until the document was
returned from Charleston, whither it had been sent. *This*
my agents have hitherto failed to do, owing, seemingly, to
the interruption of communications."

"The registry of such power of attorney," he concluded,
"is compulsory, and a copy can be obtained from the cus-
toms authorities by any one who pays the trifling fee neces-
sary."

In another paper he gave an account thus:

"In August, 1861, being then the sole registered owner of the
steamship Bermuda, I was in hopes that the blockade imposed
by the Northern government of the United States against the
southern ports might be raised by reason of intervention, ar-
rangement, or otherwise, and I accordingly caused the said
steamship to be sent on a voyage to Charleston, in South Caro-
lina.

"I was also desirous that the said steamship should be sold at
Charleston, or any other port of the United States, if the oppor-
tunity should offer and a sufficient price could be got for her. I
accordingly executed a certificate of sale authorizing Mr. Hanc-
kel and Mr. Trenholm, of Charleston, jointly or severally, to
carry into effect any desirable sale.

"I am informed and believe that the said steamship, in the
prosecution of her voyage, was not warned off by any of the
blockading cruisers, and that she entered the port of Savannah
without meeting with any of such cruisers, or having the oppor-
tunity of ascertaining whether the said blockade was in fact still
in force, and there discharged her cargo.

"In the month of January last the ship returned to England without having been sold, but the certificate of sale was not returned to me.

"In the month of February last, 1862, seeing that the blockade had become effective, and that there was little hope of its being raised, I caused the ship to be loaded for Bermuda or Nassau; and, as there was no intention of the said ship entering any of the blockaded ports, I caused application to be made to the registrar of shipping at Liverpool, to grant a new certificate of sale to some parties at Bermuda or Nassau, with a view to her sale at either of those British ports; but the said registrar declined to issue such new certificate unless the old certificate should be first given up to him cancelled.

"The old certificate has never been returned to me, probably by reason of the difficulty of communication between the Southern States and Great Britain; but it was virtually revoked and annulled in the month of February last, all intention of entering any of the Southern ports of the United States being then abandoned.

"EDWIN HAIGH."

*In regard to the munitions of war*, Blakely, late a captain in her Majesty's service, but who was now "a cannon manufacturer and merchant," swore that in shipping the cannon, shells, fuses, limbers, &c., aboard, which, it appeared, was his part of the cargo (and which he interposed in the District Court to claim), he intended part for the government of Hayti and the rest "for sale at Bermuda or Nassau, in the usual course of business, to any person willing to purchase the same;" that he had shipped the goods for Bermuda in the first instance, the steamer being bound for that port, but having been informed that Nassau, N. P., offered better opportunities, he desired them to be forwarded thence to Nassau, instructing his friends there, the Messrs. Adderly & Son, to sell those not intended for Hayti "to any persons willing to become purchasers, whether Federals, Confederates, or others, according to the prices which they might respectively offer."

[Captain Blakely, however, did not, nor did the Messrs.

Adderly, though they made oaths in the case,* produce either originals or copies of these letters.]

It is to be noted, also, that the cargo was by no means confined to munitions of war and such articles already mentioned as were plainly destined for the rebel States. A large part of it consisted of British dry goods and of groceries generally.

*As respected the "government passengers"* (the engravers or artists), who undoubtedly wished to run the blockade and get to Charleston, it appeared that they all got out at Bermuda, and that none of them rejoined the vessel when she went to Nassau.

*So in regard to Mr. Pringle and the South Carolina gentlemen,* registered by disguised names as common sailors, and brought under obligation not to quarrel, swear, carry sheath knives, interrupt divine service by indecorous conduct, &c., &c., under penalty of forfeiting more or less pay, the explanation given by Captain Westendorff was, that when they expressed their wish to embark he was on the point of sailing; and that they were put on the crew list in order to get round the British statutes, which required that before a vessel took passengers she should be inspected; an operation which would have required a week's time. All these gentlemen swore that they knew of no purpose on the vessel's part to violate the blockade. The testimony of Mr. Pringle was positive about this.

To the fifth interrogatory, *in preparatorio,* he answered as follows:

" The said vessel sailed from Liverpool on her present voyage and was bound to Bermuda *alone,* and *was not to run any blockade ;* so I was *assured* by the agents, the Messrs. Fraser, Trenholm & Co., of Liverpool, who are a branch house, I believe, of John Fraser & Co., of Charleston, S. C."

All the gentlemen, and several of the artists, in fact, while testifying distinctly their wish and intention to get

* See *supra,* p. 531.

into the Southern States, testified that they did not expect
to get there on this vessel. Indeed, on arriving at Bermuda,
they prepared and offered to the captain

### A TESTIMONIAL OF PARTING THANKS.

"ON BOARD THE STEAMSHIP BERMUDA,
20th March, 1862.

"DEAR SIR : The undersigned, passengers on board your vessel
from Liverpool to Bermuda, beg leave, before parting with you,
to express their thanks for the kind treatment and unceasing
attention which we have received at your hands. Your efforts
to add to our comfort and make our time pass pleasantly has
served in a great measure to destroy the monotony of a sea
voyage. We also take much pleasure in assuring you that the
strict attention we have observed you paid to the management
of your fine ship has been such as to make us feel always a per-
fect security and confidence under your care. With our best
wishes for your future prosperity,

We are, dear sir, yours, respectfully,

| | |
|---|---|
| J. J. PRINGLE, | W. E. SPARKMAN, |
| GEORGE DUNN, | WM. G. EMBLETON, |
| JAMES McHUGH, | P. GELLATLY, |
| GEORGE HENRY KEELING, | J. McFARLAND, |
| J. J. PRINGLE, JR., | ARTHUR HUGER, |
| J. POINSETT PRINGLE, | JNO. GEMMELL." |

It was not pretended that any of these passengers had
concealed their true character from the captain, or in any
way changed at any time their ordinary dress; or that they
had made concealments of any sort.

The following, in material parts, was the letter of instruc-
tions, which, when the vessel set sail from Liverpool, the
captain received:

"LIVERPOOL, 28th February, 1862.
"CAPTAIN C. W. WESTENDORFF,
Steamship Bermuda.

"DEAR SIR : You will proceed hence to the port of *Hamilton*,
*Bermuda*, and *there* deliver your cargo, as per bills of lading.

Inclosed is a letter of introduction to Mr. N. T. Butterfield, who will assist you in the purchase of coals and in the disbursements of your ship. The bills inclosed (£500) on the Bank of Liverpool, will furnish you the means of paying your disbursements in Bermuda.

" Instructions will follow you as to a return cargo for your ship. If you should have any surplus funds after paying the accounts of the ship, you will bring them in *British gold;* but should you require more money than the bills herewith will furnish you, we authorize you to value upon us at short sight for what may be wanted, and Mr. Butterfield will assist you in negotiating your bill upon us.

" Our friends in St. John, N. B., are Messrs. W. & R. Wright, and in Nassau, N. P., Messrs. Henry Adderly & Co.; and *in case of having to take cargo from Bermuda to either of these ports,* you will call upon them.

" We are, dear sir, yours truly,

"FRASER, TRENHOLM & CO.,

" Agents of the owner."

There was no concealment, apparently, as to anything on board. Everything was fairly entered on the bills of lading and manifest. The crew were shipped, it seemed, for a term not exceeding twelve months, from Liverpool to Bermuda, thence, if required, to any ports or places in the West Indies, British North America, *United States,* and back to the United Kingdom. The wages, if fairly set down, seemed to be at a rate not exceeding that of ordinary voyages in peaceful times, without special risk.

The court below condemned the vessel and the part of her cargo which consisted of munitions of war; reserving judgment as to the rest. Appeals were now taken here by Mr. Haigh and Captain Blakely. The case was twice elaborately and very well argued, both on reason and authorities, once at the last term and again at this.

*Mr. G. M. Wharton and Mr. W. B. Reed, on both arguments, for these appellants:* There is really no sufficient evidence of enemy ownership of the vessel. Such ownership is denied positively by numerous respectable persons on oath. The

control which John Fraser & Co., of Charleston, had over the voyage of the ship, did not clothe them with any ownership, even in a prize court. That control must be treated as confined to a direction of the ship within the limits of her prescribed voyage, and if that voyage did not include a trip to any blockaded port, or to any port of the enemies of the United States, it cannot affect injuriously the neutral owners. The power of attorney from Mr. Haigh, was not accompanied with any interest in the attorney. Any sale under it must have been for the use of the principal, and all money received under it would have been the funds of the principal. The power had no reference to the then voyage of the Bermuda. It was an unexecuted one and capable of revocation. If the Bermuda were not, on the voyage in question, destined to a Southern port, the execution of the power would either have been impracticable, or could only have been carried into effect through correspondents in some neutral territory.

Neither is there any sufficient evidence that the vessel meant to run the blockade. Her instructions were to go to Bermuda, to *deliver* her cargo there, and to bring back a return in British gold; and while there was a provision made for the possibility of carrying the cargo to Nassau, there was none for a destination beyond. The vessel was captured in her direct course to a port confessedly neutral. The artists, who, all admit wished to get to the Southern States, left the vessel when she got to Bermuda. They left her, because on *her* they could not get to our Southern States. Mr. Pringle, and his friends who embarked at Liverpool, it is as plain, originally expected to go on *this* vessel to Bermuda only; and though they went on her to Nassau afterwards, it was in the expectation of finding some other conveyance thence to Charleston. The testimony of Mr. Pringle, whose accuracy no one who knew him will question, is positive that the parties knew of no purpose to run the blockade. The unsigned letter attributed to an engineer of the Bermuda — and which will be relied on to support a condemnation—disproves intent to run a blockade. After saying that a detec-

tive was watching them, and that great jealousy existed on account of the cargo, it declares: "Fortunately they cannot stop us. *We* are on a *lawful* voyage. People won't believe it. They are bound to think we are for running the blockade." And this foregone conclusion about the Bermuda, which it seems was conveyed here by detectives when she was on the stocks, has been one of the worst impediments to justice in our case. The government had ordered the Bermuda to be captured wherever found.* It is assumed, without proof, that the vessel belonged to Fraser, Trenholm & Co.; and then inferred as an irresistible conclusion that they could not own any vessel and not set her to breaking a blockade.

It being impossible to fix unlawful enterprise on the Bermuda, it will be said that the purpose was to transship the Bermuda's cargo at Bermuda or Nassau? That is easy to conceive of and to suggest, and even to aver. But conception, suggestion, and even averment are of no weight. Does the evidence *prove* such a purpose? We say that it does not. It will be argued that the "Herald" was to perform this office for the Bermuda. The only thing which gives countenance to such an idea is the unsigned and not very trustworthy letter said to have been written by the Bermuda's engineer. The inference is a strained one which gets this purpose of the Herald from that scrawl; one which, moreover, declares on its face that the voyage on which the Bermuda was about to sail, was a "lawful voyage:" which, would it be if the Herald went as a tender to transship?

The one or two memoranda found on board and said to have been for Captain Westendorff are of the least possible significance. If there be anything in them which shows that they were orders to bring articles through the blockade—which there is not at all as respects the largest—there is assuredly nothing which proves that Captain Westendorff

---

* See correspondence of Lord Lyons and Mr. Seward, in August, 1862, after the capture, in which these general orders referring to a list were rescinded. (Parliamentary papers, No. 5, 1863.)

did execute them, or ever meant to execute them, especially to execute them for this voyage or by this ship.

That portions of the cargo—the cutlery, &c.—were intended to invite purchasers at Bermuda for the Southern States may be; but that does not prove enemy ownership in this vessel or her intent to run the blockade. The articles at best were but a fraction, and not a large one, of the cargo; and after having mingled with the stock of the commerce of Bermuda—or Nassau,—sold, *bonâ fide*, to British subjects there—would have found purchasers from the Southern States, of which class of persons the islands had many.

As to the cannon and other munitions of war—sent by Captain Blakely—his affidavit in explanation is clear, reasonable, and sufficient. Federals and Confederates to him were both alike. He was any man's customer in a war.

The fact that Mr. Pringle and his friends, as well as the artists, were entered on the crew list as sailors is abundantly explained by Captain Westendorff. They had not disguised themselves when captured; nor at any time. Indeed there was no concealment as to any part of the cargo. Everything was on the bills and manifests.

The counsel for the claimants then submitted these points of law, which they enlarged upon, enforced, and applied:

1. If the Bermuda were on a voyage, at the time of her capture, from the port of Bermuda, a neutral port, to the port of Nassau, another neutral port, being then a British vessel and owned by a British subject, she was not liable to capture. In order to render her so liable to capture, under these circumstances, she must have been actually on a voyage to Charleston, or some other blockaded port of the Southern States, with an intent to run the blockade.

2. There can be no legal blockade by a belligerent of any other than a hostile port. There can be none of a neutral port. The Bermuda was, therefore, at perfect liberty to navigate to and fro among the British West India islands,

so far as the question of blockade is concerned, unless she were actually on a voyage to a blockaded port of our country. No blockade of a Southern port could be lawfully extended so as to embrace the waters lying between or about the West India islands.

3. There can be no proper legal assertion of a continued voyage of which Nassau was but an intermediate port, unless the evidence shows (which it does not) that the Bermuda was on her way to a blockaded port, *viâ* Nassau. Every voyage must have a *terminus a quo* and a *terminus ad quem;* the latter of which, under the evidence, was a port of discharge in the United Kingdom; and no part of the evidence shows that the Bermuda herself was to proceed as a part of her voyage to any blockaded port. It was no breach of the blockade of any such port to intend to land her cargo, either at Bermuda or Nassau, even though some other vessel was afterwards to endeavor to carry on the cargo to Charleston, provided the Bermuda herself was to return to England.

4. What the voyage of the Bermuda was, is a question of fact to be deduced from all the evidence in the cause. The shipping articles which described it with particularity, are persuasive evidence of the voyage on which the Bermuda started from Liverpool. The letter of instructions to the captain at that place, is in accordance with the shipping articles. The legal construction of those documents is, that the violation of a blockade was not embraced by them; and that if, after arriving at Bermuda the ship should be ordered to a port of the United States, some open port, and not a blockaded port, must have been intended. The instruction to the captain which he received at Bermuda to proceed to Nassau, exhausted the power which the verbal charterers of the ship had over her; and after leaving Nassau under the terms of the voyage, she could only be brought back to the United Kingdom.

5. British merchants, as neutrals in our present war, had a perfect right to trade, even in military stores, between their own ports, and to sell at one of them, even to an enemy of

the United States, goods of all sorts, although with a knowledge that the purchaser bought them with a view of employing them afterwards out of the neutral territory in war against us. A neutral may sell in his own territory, to either belligerent, munitions of war; the only exception, so far as England and America are concerned, being a prohibition against fitting out vessels of war, or warlike expeditions, in the neutral country, against one of the belligerents.

6. The question of contraband of war cannot arise with respect to any portion of the Bermuda's cargo, unless she were on a voyage to a blockaded port. It is not necessary in law to show that it was part of the intention of the shippers of the cargo to land and sell it at Nassau. If it was intended to be stored there, and the voyage of the Bermuda to terminate at that place, except as regards her return to England, no question of contraband can arise in the cause.

7. Spoliation of papers is cause of condemnation, and excludes further proof only as against the party committing it, if interested in the vessel or cargo. Against a party not committing the spoliation, and not authorizing it, nor interested in the act, it neither excludes further proof, nor is it damnatory where other circumstances are clear.

8. There is no proof in the cause that any spoliation of papers was authorized by Mr. Haigh, or conduced to his benefit as owner of the ship; nor is there any evidence of the spoliation of any papers which might properly be considered as proprietary documents.

9. The capture of the Bermuda was unjustifiable; because, first, it was made within the range of modern cannon-shot from British territory; second, it was made within a space embraced by a line drawn due south from the nearest headland on the island of Abaco, above the place of capture; third, because it was made, not on the open sea, but in waters constituting channels between islands belonging to Great Britain, a neutral power; and fourth, because it was made before actual search, and under a general authority to seize certain vessels wherever found.

On each of these points, we conceive that authorities sustain us.*

After argument, on the other side, by *Mr. Speed, A. G.*, and by *Mr. Coffey*, special counsel of the captors, who argued the case thoroughly every way—on the facts, on principles of public law, and on English and American precedents—

The CHIEF JUSTICE delivered the opinion of the court.

These appeals were very fully and ably argued at the last term; and, because of the desire of the court to have all the aid that counsel could give in the examination of the important questions of fact. and law presented by the record, were ordered to be reargued at this term. Under this order they have been again thoroughly and exhaustively discussed, and have since received our most deliberate consideration.

The questions arising upon the ownership of the steamship, will first be disposed of.

She was built in 1861, on the eastern coast of England, at Stockton-upon-Tees. On the 1st of August in that year, Edwin Haigh made the declaration of ownership required by the British Merchants' Shipping Act of 1854.† In this

---

* On the first three points the counsel cited The Ada, Daveis, 407; The Moss, Gilpin, 219; The Steen Bille, cited in Dean on Blockade (Introduction), p. xii; The Jonge Pieter, 4 Robinson, 65; The Stert, Id. 53; The Maria, 5 Id. 325; The Thomyris, Edwards, 17.

On the 5th and 6th points: Hautefeuille, Des Droits et des Devoirs des Nations Neutres, tome iii, pp. 222–3; The Imina, 3 Robinson, 167; The Hendrick and Alida, 1 Hay & Marriot, 96; Wheaton's International Law, 568; The Jacob, 1 Robinson, 90; The Tobias, 1 Id. 329; The Franklin, 3 Id. 217; The Neutralitet, 3 Id. 295.

On the 7th and 8th: The Rising Sun, 2 Robinson, 104; The Hunter, 1 Dodson, 480; The Pizarro, 2 Wheaton, 227.

On the 9th: the question of immunity from capture within actual range of modern cannon-shot—one of the points assumed here—was discussed very interestingly, and with great ingenuity and learning; but it all having been on the assumption of a case not regarded by the court as proved, the author-ities are not presented.

† 22 British Statutes at Large, 267, 351, 352.

declaration he described himself as a natural born British subject, asserted himself to be the sole and exclusive owner, and named E. L. Tessier as master.  Upon this declaration a certificate of registry was issued the next day, which repeated the statement that Haigh was owner, and Tessier master; and on the following day, the 3d of August, a joint and several power of attorney to sell the ship, at any place out of the kingdom, at any time within twelve months, and for any price thought sufficient by the attorneys, or either of them, was given by Haigh to A. S. Hanckel and G. A. Trenholm, of Charleston, in South Carolina.  With these papers the steamship was despatched to Charleston, on her first voyage; but finding, probably, the entrance of that port too dangerous, ran successfully the blockade of Savannah, and returned to England in January, 1862, after an absence of about five months.

The power of sale was sent to Charleston, and remained there.  Haigh asserts that this power was intended only for the first voyage; was given because he wished to have the steamer sold in Charleston, or in some other port of the United States, if opportunity should offer, and a sufficient price could be obtained; and was afterwards virtually revoked when he abandoned the idea of sending her again to any southern port.

It is unfortunate for the credit of these statements, that the power was given to enemies of the United States, resident in Charleston, without access to any loyal port except by running the blockade; that it was not limited by its terms to the first voyage, but, on the contrary, was to continue in force twelve months; that it contained no provision insuring a sufficient price, but left that matter, so important to a real owner contemplating a real sale, to the decision of the attorneys, or either of them; and that there is no evidence in the record of any actual revocation of the power, or of any attempt to revoke it, and none, except Haigh's assertion, that the purpose of again sending the ship to a rebel port was ever abandoned.

These first acts bring the ownership into doubt.  Haigh

may have been then the true owner; but it is certainly strange that he was in such haste to remove her from his own neutral control, and place her absolutely in the power and at the disposal of the enemies of the United States.

After her return to England a new voyage was planned for the Bermuda, and Fraser, Trenholm & Co., under whose direction, probably, the first voyage was made, now appear conspicuously in her concerns.

Of the members of this firm, Fraser and Trenholm were, doubtless, citizens of South Carolina; so also were, probably, Prioleau and Wellsman, who are mentioned as partners.* The only partner whose declaration that he was a British subject appears in the record was J. R. Armstrong. The Liverpool house thus composed was a branch of the house of John Fraser & Co., of Charleston, and was employed as a depositary and agent of the rebel government at Richmond.†

It was under the direction of this firm that the Bermuda was loaded at Liverpool in February, 1862.

Her former master, Tessier, had been transferred to the Bahama, then at Stockton-on-Tees, but destined to become notorious three months later by her employment, under Tessier, in the conveyance of guns and munitions to the Alabama.‡ In his place, Westendorff had become master of the Bermuda. This person, a citizen of South Carolina, arrived in Liverpool from Charleston in December, in command of the Helen, a ship belonging to John Fraser & Co. Through Fraser, Trenholm & Co., he obtained the official certificate of competency necessary to enable him to take command of the Bermuda, and was appointed master, probably by them, on the 17th January. On the day before this appointment, Fraser, Trenholm & Co. had advised John Fraser & Co. of the despatch of the ship Ella with a cargo to Bermuda Island, to be followed by the steamship Bermuda with goods. The letter containing the advice is not in the record, but the fact appears from a letter of John Fraser & Co. to N. T. Butterfield at Bermuda, relating to these vessels and their cargoes.

---

* Diplomatic Correspondence, 1863, Part I, App., p. lxxii.
† Ib., 1863, Part I, p. 90.    ‡ Ib., 224, 304, and App., lxxv.

The Bermuda, at the date of the Liverpool letter, was lying at a port on the eastern coast, but was at once brought round to Liverpool to receive her cargo.

Her whole lading was under the direction of the Liverpool firm. Haigh was not known in it; while, on the other hand, Fraser, Trenholm & Co. were regarded as owners by many persons on the ship, and by others who certainly were not ill-informed. Thus Tessier, then in command of the Bahama, writing to Westendorff on the 20th February, spoke of Fraser, Trenholm & Co. as " our owners." And so Graham, chief engineer of the Bermuda, deposed on the preparatory examination, " To the best of my knowledge and belief, Fraser, Trenholm & Co. of Liverpool, England, are the owners of the captured vessel." The depositions of Heenan, Noble, and Pierson, firemen on board, were to the same effect.

Against this evidence are the declaration of Haigh, the deposition of Westendorff, and the affidavit of Armstrong, all affirming ownership in Haigh.

Thus stood matters in relation to ownership when the Bermuda left Liverpool on the 1st of March. She was controlled absolutely, in all respects, by Fraser, Trenholm & Co., and they were quite generally regarded as her owners. They, on the other hand, assert that Haigh was the real owner, and that they were acting as his agents; admitting, however, that they had no charter, and no written authority to represent him.

On the day before sailing, Fraser, Trenholm & Co. addressed a letter to the master, Westendorff, directing him to proceed to the island of Bermuda, and deliver his cargo according to the bills of lading. After some general directions as to money for disbursements and other matters, the letter concludes with the information that " the friends" of the firm " in Nassau, New Providence, are H. Adderly & Co.," and with a direction to " call on them, in case of having to take cargo from Bermuda to that port." What other special instructions were given to Westendorff, at Liverpool, the record does not disclose. Every bill of lading required

the cargo mentioned in it to be delivered at Bermuda, to order or assigns. It is clear that the ship was to go to Bermuda, and not beyond, unless something not specified should occur; and the cargo was to be delivered there and not elsewhere, except in the same contingency, to the order of somebody not named.

The ship arrived at the port of St. George's, in Bermuda, on the 19th or 20th March, and remained there five weeks waiting for orders.

And here we may expect to learn who was the unnamed party to whose order the cargo was to be delivered, and what was the contingency in which it was to be taken from Bermuda to another port.

Haigh asserts, and so does Westendorff, that the unnamed consignee was one Butterfield, a resident of Hamilton, one of the ports of Bermuda, and that Butterfield, as consignee of the cargo, being desirous to have it carried on to Nassau, "made an arrangement with the master to that effect." Nothing in the proofs supports, but everything contradicts, this. Butterfield is nowhere named in any paper as consignee; we find no instructions anywhere given to deliver the cargo to him; nor was it by his direction or arrangement that the cargo was sent forward from Bermuda to Nassau.

The real state of facts is disclosed by the letters of Fraser, Trenholm & Co. to John Fraser & Co., and of John Fraser & Co. to N. T. Butterfield, considered in connection with some other matters in the record. On the 23d January, 1862, the branch house at Liverpool wrote to the Charleston house, giving advice of the immediate despatch of the ship Ella to Bermuda with a cargo consigned to John Fraser & Co., or their authorized agent, with authority to dispose of it in any market they should select. This letter suggested that if the Charleston house should not think best to send an agent to Bermuda, any communication for the master of the Ella should be sent, under cover, to Butterfield, and added, that the master was instructed to await orders at Bermuda. On the 28th of February the Liverpool firm directed another letter to John Fraser & Co., or their au-

thorized agent at Bermuda, in which they spoke of the "invoices and bills of lading" of the cargo of the Bermuda as "very full, and as suited to facilitate greatly the delivery and also the transshipment, should this be determined upon." The letter goes on to say that, "should the loss of any of the invoices or bills of lading unfortunately happen, duplicates can be furnished hereafter," but strongly urges, "in case of an opportunity to send them forward with the letters, the adoption of the most certain measures of preventing any of them falling into improper hands."

These letters show what unlimited control John Fraser & Co. were expected to exercise over the ship and cargo of the Bermuda; and that control was exercised.

They had been advised of the coming both of the Ella and Bermuda by the letter of the 16th of January, and on the 1st of April they wrote to their correspondent, Butterfield, saying: "We suppose the steamer Bermuda may be with you ere this, and the ship Ella. We will thank you to request the masters to act as follows, namely: Captain Westendorff to take in the tea and other light articles per Ella, if he has room for them, and proceed to Nassau, reporting himself, on arrival there, to Messrs. Henry Adderly & Co.; Captain Carter to keep in his cargo, and wait further orders from us. They will reach him, we think, very shortly."

This direction was received at Hamilton, where Butterfield resided, on the 19th of April, and was forwarded the same day to Westendorff, at St. George's, and was implicitly obeyed. Captain Westendorff even refused to allow certain printing presses and materials, which formed part of his cargo, to be landed at Bermuda, though requested to do so by George Dunn, the person who seems to have had them in charge, and though the bills of lading expressly required that they should be delivered at Bermuda. He said that the bills were "signed to be delivered to order;" that "the responsibility" of delivery to Dunn would be too great, unless he received instructions to that effect.

No ownership could give more absolute control than was exercised over the ship and whole cargo by John Fraser &

Co. That control and the action of the master leave no doubt that they were the unnamed party to whom the cargo was to be delivered, and whose orders the Bermuda was to await; nor can there be any doubt that Westendorff had instructions to obey, absolutely and in all things, their directions, both as to ship and cargo.

Whether the cargo was to be transshipped, or to be carried on to Charleston without transshipment, was probably left to be determined by circumstances after arrival at Nassau.

It appears from letters and papers in the record that a light draft steamship, named the Herald, was connected with the Bermuda as a tender; and it seems that it was to transshipment into that steamship that Fraser, Trenholm & Co. referred in their letter of January 28.

There is not much about the Herald in the record; but what we find is instructive. A letter, dated Liverpool, February 16, 1862, without signature, but addressed to one of the engineers of the Bahama, and written, probably, by one of the engineers of the Bermuda, says: "Our tender left yesterday; don't be at all surprised that we have got a tender. They bought a light draft boat at Dublin, used to run the mail once, called the Herald." The writer proceeds to describe this tender as "two hundred and eighty feet in length," drawing "ten feet heavy, and five and a half feet light;" with "her boilers stayed and strengthened;" with "an average speed of eighteen and a half knots;" with "all her lower cabins razeed to make cargo space;" with "a crew shipped for twelve months, for some port or ports south of Mason's and Dixon's line;" with "three captains on board: one an Englishman, nominal; another, an experienced coast pilot from the Potomac to Charleston; and another, the same from Charleston to San Juan." This correspondent expresses the opinion, that "if the Yankees catch her, they are smarter than he gives them credit for;" and adds, "she waits our arrival at Bermuda," "but goes into Charleston first, to see about the stone fleet." The letter of Tessier to Westendorff, written four days later and already cited, speaks of the Herald as on her voyage across

the Atlantic, under the command of Captain Mitchell. There is a statement, too, in the deposition of Farrally, one of the firemen of the Bermuda, that the Herald was at Bermuda with several captains, while the steamship was there, and was understood to be intended to run the blockade; and that it was " the talk that the Herald was connected with our ship." It appears, also, from a bill of exchange drawn by Mitchell, master of the Herald, on Fraser, Trenholm & Co., that Westendorff supplied funds for that steamer at . Bermuda.

This bill must have been drawn under instructions, and the fact strongly confirms what other parts of the record disclose of the connection between the two vessels.

The attendance of the Herald was, doubtless, to facilitate transshipment, should transshipment be directed by John Fraser & Co., and to secure the conveyance of the cargo to its ultimate destination.

Why no transshipment took place at Bermuda; whether transshipment was intended at Nassau; whether the Herald visited Charleston during the detention of Westendorff's ship at St. George's; whether it was finally concluded that the Bermuda herself should attempt to run the blockade, are matters thus far left in doubt.

The Bermuda sailed from St. George's on the 23d of April, and was captured on the 27th.

At the time of capture, two small boxes and a package, supposed to contain postage-stamps, were thrown overboard, and a bag, understood to contain letters, was burned. The bag was burned by the captain's brother, and under the orders of the captain, after the vessel had been boarded by the captors. It was burnt, as Westendorff says, in pursuance of his instructions. One of the passengers, also, burned a number of letters, which, he says, were private.

The instructions, in pursuance of which this destruction of papers was made, are not produced; nor is any explanation of this spoliation offered. The instructions were, doubtless, given by John Fraser & Co., in view of the contingency of capture, and were in accordance with the suggestion of

Fraser, Trenholm & Co.'s letter of the 28th of February, that the most certain measures should be adopted to prevent any of the bills of lading or invoices falling into improper hands. They, doubtless, included directions for the destruction of all compromising papers, and among them of the instructions themselves. If they had been preserved and produced, it is not unlikely that they would have disclosed the real ownership of the vessel, the true nature of her employment, and the actual destination of both ship and cargo.

This spoliation was one of unusual aggravation, and warrants the most unfavorable inferences as to ownership, employment, and destination.

All these transactions, prior to capture, and at the time of capture, repel the conclusion that Haigh was owner. Not a document taken on the ship shows ownership in him except the shipping articles, and these were false in putting upon the crew list employees of the rebel government and enemy passengers—the last under assumed names. He was permitted to put into the cause his original declaration of ownership of August 1, 1861, by way of further proof; but we cannot give much weight to this, in view of the "Certificate of Transactions subsequent to Registry," which shows his execution of the power of sale to Hanckel & Trenholm. After giving that power, there is no indication that he performed a single act of ownership. No letter alluded to him as owner. No direction relative to vessel or cargo recognized him as owner. All the papers and all the circumstances indicate rather that a sale was made in Charleston under the power, by which the beneficial control and real ownership were transferred to John Fraser & Co., while the apparent title, by the British papers, was suffered to remain in Haigh as a cover.

The spoliation makes the conclusion of ownership out of Haigh and in John Fraser & Co. wellnigh irresistible. Would the master have obeyed such instructions from John Fraser & Co., if he had been really appointed by Haigh, and was really responsible to him as owner? We are obliged to

think that the ownership of Haigh was a pretence, and that the vessel was rightly condemned as enemy property.

We will next consider the questions relating both to vessel and cargo, which join arising from employment in the trade and under the direction and control shown by the record, assuming for the moment that Haigh was owner.

How, then, was the Bermuda employed? In what trade, and under what control and direction?

The theory of the counsel for Haigh is that she was a neutral ship, carrying a neutral cargo, in good faith, from one neutral port to another neutral port; and they insist that the description of cargo, if neutral, and in a neutral ship, and on a neutral voyage, cannot be inquired into in the courts of a belligerent.

We agree to this. Neutral trade is entitled to protection in all courts. Neutrals, in their own country, may sell to belligerents whatever belligerents choose to buy. The principal exceptions to this rule are, that neutrals must not sell to one belligerent what they refuse to sell to the other, and must not furnish soldiers or sailors to either; nor prepare, nor suffer to be prepared within their territory, armed ships or military or naval expeditions against either. So, too, except goods contraband of war, or conveyed with intent to violate a blockade, neutrals may transport to belligerents whatever belligerents may agree to take. And so, again, neutrals may convey in neutral ships, from one neutral port to another, any goods, whether contraband of war or not, if intended for actual delivery at the port of destination, and to become part of the common stock of the country or of the port.

It is asserted by counsel that a British merchant, as a neutral, had, during the late civil war, a perfect right to trade, even in military stores, between their own ports, and to sell at one of them goods of all sorts, even to an enemy of the United States, with knowledge of his intent to employ them in rebel war against the American government.

If by trade between neutral ports is meant real trade, in

the course of which goods conveyed from one port to another become incorporated into the mass of goods for sale in the port of destination; and if by sale to the enemies of the United States is meant sale to either belligerent, without partiality to either, we accept the proposition of counsel as correct.

But if it is intended to affirm that a neutral ship may take on a contraband cargo ostensibly for a neutral port, but destined in reality for a belligerent port, either by the same ship or by another, without becoming liable, from the commencement to the end of the voyage, to seizure, in order to the confiscation of the cargo, we do not agree to it.

Very eminent writers on international maritime law have denied the right of neutrals to sell to belligerents, even within neutral territory, articles made for use in war, or to transport such articles to belligerent ports without liability to seizure and confiscation of goods and ship. And this is not an illogical inference from the general maxim that neutrals must not mix in the war. International law, however, in its practical administration, leans to the side of commercial freedom, and allows both free sale and free conveyance by neutrals to belligerents, if no blockade be violated, of all sorts of goods except contraband; and the conveyance, even of contraband goods, will not, in general, subject the ship, but only the goods, to forfeiture.

We are to inquire, then, whether the Bermuda is entitled to the protection of this rule, or falls within some exception to it.

It is not denied that a large part of her cargo was contraband in the narrowest sense of that word. One portion was made up of Blakely cannon and other guns in cases, of howitzers, of cannon not in cases, of carriages for guns, of shells, fuses, and other like articles—near eighty tons in all; and of seven cases of pistols, twenty-one cases of swords, seventy barrels of cartridges, three hundred whole barrels, seventy-eight half-barrels, and two hundred and eighty-three quarter-barrels of gunpowder. Another portion consisted of printing-presses and materials, paper, and Confederate States

postage stamps, and is described in a letter, found on board, as "presses and paraphernalia complete," "obtained from Scotland by a commissioner of the Confederate government,' and sent with a "lot of printers and engravers." The names of these printers and engravers, or at least the names by which they were known on board, are in the crew list; but Westendorff, in a letter already referred to, calls them his "government passengers;" and all the facts connected with this part of the cargo indicate that it actually belonged to the rebel government and was intended for its immediate use. Other very considerable portions of the cargo were also contraband within the received definitions of the term.

The character of this cargo makes its ulterior, if not direct, destination to a rebel port quite certain. And there is other evidence. The letters of Fraser, Trenholm & Co. make distinct references to the contingency of transshipment; and the evidence shows that the Herald was sent over with a view to this. The consignment of the whole cargo was to order or assigns—that is to say, as we have seen, to the order of John Fraser & Co. or assigns, and is conclusive, in the absence of proof to the contrary, that its destination was the port in which the consignee resided and transacted business.* There is much other evidence leading to the same conclusion; but it is needless to go further.

It makes no difference whether the destination to the rebel port was ulterior or direct; nor could the question of destination be affected by transshipment at Nassau, if transshipment was intended, for that could not break the continuity of transportation of the cargo.

The interposition of a neutral port between neutral departure and belligerent destination has always been a favorite resort of contraband carriers and blockade-runners. But it never avails them when the ultimate destination is ascertained. A transportation from one point to another remains continuous, so long as intent remains unchanged, no matter what stoppages or transshipments intervene.

---

* Grove v. O'Brien, 8 Howard, 439; Lawrence v. Minturn, 17 Id. 106.

This was distinctly declared by this court in 1855,* in reference to American shipments to Mexican ports during the war of this country with Mexico, as follows: "Attempts have been made to evade the rule of public law by the interposition of a neutral port between the shipment from the belligerent port and the ultimate destination in the enemy's country; but in all such cases the goods have been condemned as having been taken in a course of commerce rendering them liable to confiscation."

The same principle is equally applicable to the conveyance of contraband to belligerents; and the vessel which, with the consent of the owner, is so employed in the first stage of a continuous transportation, is equally liable to capture and confiscation with the vessel which is employed in the last, if the employment is such as to make either so liable.

This rule of continuity is well established in respect to cargo.

At first, Sir William Scott held that the landing and warehousing of the goods and the payment of the duties on importation was a sufficient test of the termination of the original voyage; and that a subsequent exportation of them to a belligerent port was lawful.† But in a later case, in an elaborate judgment, Sir William Grant‡ reviewed all the cases, and established the rule, which has never been shaken, that even the landing of goods and payment of duties does not interrupt the continuity of the voyage of the cargo, unless there be an honest intention to bring them into the common stock of the country. If there be an intention, either formed at the time of original shipment, or afterwards, to send the goods forward to an unlawful destination, the continuity of the voyage will not be broken, as to the cargo, by any transactions at the intermediate port.

There seems to be no reason why this reasonable and settled doctrine should not be applied to each ship where several

* Jecker v. Montgomery, 18 Howard, 114.

† The Polly, 2 Robinson, 369.

‡ The William, 5 Id. 395; 1 Kent's Commentaries, 84, note

are engaged successively in one transaction, namely, the conveyance of a contraband cargo to a belligerent.  The question of liability must depend on the good or bad faith of the owners of the ships.  If a part of the voyage is lawful, and the owners of the ship conveying the cargo in that part are ignorant of the ulterior destination, and do not hire their ship with a view to it, the ship cannot be liable; but if the ulterior destination is the known inducement to the partial voyage, and the ship is engaged in the latter with a view to the former, then whatever liability may attach to the final voyage, must attach to the earlier, undertaken with the same cargo and in continuity of its conveyance.  Successive voyages, connected by a common plan and a common object, form a plural unit.  They are links of the same chain, each identical in description with every other, and each essential to the continuous whole.  The ships are planks of the same bridge, all of the same kind, and all necessary to the convenient passage of persons and property from one end to the other.

There remains the question whether the Bermuda, on the supposition that she was really a neutral ship, should be condemned for the conveyance of contraband.  For, in general, as we have seen, a neutral may convey contraband to a belligerent, subject to no liability except seizure in order to confiscation of the offending goods.  The ship is not forfeited, nor are non-offending parts of the cargo.

This has been called an indulgent rule, and so it is.*  It is a great, but very proper relaxation of the ancient rule, which condemned the vessel carrying contraband as well as the cargo.  But it is founded on the presumption that the contraband shipment was made without the consent of the owner given in fraud of belligerent rights, or, at least, without intent on his part to take hostile part against the country of the captors; and it must be recognized and enforced in all cases where that presumption is not repelled by proof.

* The Ringende Jacob, 1 Robinson, 90; The Sarah Christina, Id. 238. See opinions of Bynkershoeck and Heineccius, cited in notes to The Mercurius, Id. 288, and The Franklin, 8 Id. 222.

The rule, however, requires good faith on the part of the neutral, and does not protect the ship where good faith is wanting.

*The Franklin*, therefore, carrying contraband with a false destination, was condemned, after mature consideration, by Sir William Scott in 1801.* He said that, " the benefit of the relaxation could only be claimed by fair cases." This doctrine was shortly after applied to *The Neutralitet* by the same great judge;† and it received the sanction of this court in an opinion delivered by an equal judge, in 1834.‡ The leading principle governing this class of cases was stated very clearly by Mr. Justice Story in that opinion, thus: " The belligerent has a right to require a frank and *bonâ fide* conduct on the part of neutrals in the course of their commerce in times of war, and if the latter will make use of fraud and false papers to elude the just rights of belligerents and cloak their own illegal purposes, there is no injustice in applying to them the penalty of confiscation."

Mere consent to transportation of contraband will not always or usually be taken to be a violation of good faith. There must be circumstances of aggravation. The nature of the contraband articles and their importance to the belligerent, and the general features of the transaction, must be taken into consideration in determining whether the neutral owner intended or did not intend, by consenting to the transportation, to mix in the war.

*The Ranger*, though a neutral vessel, was condemned for being employed in carrying a cargo of sea stores to a place of naval equipment under false papers. The owner had not consented, but the master had, and Sir William Scott said, " If the owner will place his property under the absolute management and control of persons who are capable of lending it in this manner to be made an instrument of fraud in the hands of the enemy, he must sustain the consequences of such misconduct on the part of his agent."§

---

* The Franklin, 3 Robinson, 224.     † The Neutralitet, Id. 296.

‡ Carrington *v.* Merchants' Insurance Co., 8 Peters, 518, opinion by Story, J.        § The Ranger, 6 Robinson, 126.

So, too, *The Jonge Emilia,* a neutral vessel, was condemned on the ground that she appeared to have been altogether in the hands of enemy merchants and employed for seven voyages successively in enemy trade;* and *The Carolina†* was condemned for employment in the transportation of troops, though the master alleged that it was under duress, and the actual service was at an end.

Now, what were the marks by which the conveyance of contraband on the Bermuda was accompanied? First, we have the character of the contraband articles, fitted for immediate military use in battle, or for the immediate civil service of the rebel government; then the deceptive bills of lading requiring delivery at Bermuda, when there was either no intention to deliver at Bermuda at all, or none not subject to be changed by enemies of the United States; then the appointment of one of these enemies as master, necessarily made with the knowlege and consent of Haigh, if he was owner; then the complete surrender of the vessel to the use and control of such enemies, without even the pretence of want of knowledge, by the alleged owner, of her destined and actual employment.

We need not go further. We are bound to say, considering the known relations of Fraser, Trenholm & Co. with the rebel leaders; and the relations of John Fraser & Co. to the same combination, justly inferable from the fact that they were the consignees of the whole cargo; and considering, also, the ascertained character of most of it, that it seems to us highly probable that the ship, at the time of capture, was actually in the service of the so-called Confederate government, and known to be so by all parties interested in her ownership.

However this may be, we cannot doubt that the Bermuda was justly liable to condemnation for the conveyance of contraband goods destined to a belligerent port, under circumstances of fraud and bad faith, which make the owner, if

---

* The Jonge Emilia, 3 Robinson, 52.　　† The Carolina, 4 Id. 256.

Haigh was owner, responsible for unneutral participation in the war.

The cargo, having all been consigned to enemies, and most of it contraband, must share the fate of the ship.

Having thus disposed of the questions connected with the ownership, control, and employment of the Bermuda, and the character of her cargo, we need say little on the subject of liability for the violation of the blockade. What has been already adduced of the evidence, satisfies us completely that the original destination of the Bermuda was to a blockaded port; or, if otherwise, to an intermediate port, with intent to send forward the cargo by transshipment into a vessel provided for the completion of the voyage. It may be that the instructions to Westendorff were not settled when the steamship left St. George's for Nassau; but it is quite clear to us that the ship was then at the disposition of John Fraser & Co., and that the voyage, begun at Liverpool with intent to violate the blockade, delayed at St. George's for instructions from that firm, continued toward Nassau with the purpose of completion from that port to a rebel port, either by the Bermuda herself or by transshipment, was one voyage from Liverpool to a blockaded port; and that the liability to condemnation for attempted breach of blockade was, by sailing with such purpose, fastened on the ship as firmly as it would have been by proof of intent that the cargo should be transported by the Bermuda herself to a blockaded port, or as near as possible, without encountering the blockading squadron, and then sent in by a steamer, like the Herald, of lighter draft or greater speed.

We have not thought it necessary to examine the questions made by counsel touching the right of belligerents to make captures within cannon-shot range of neutral territory, for there is nothing in the evidence which proves to our satisfaction that the Bermuda was within such range.

Our conclusion is, that both vessel and cargo, even if both were neutral, were rightly condemned; and, on every ground, the decree below must be

AFFIRMED.

[After the preceding confirmation of the decree of the District Court of Philadelphia—which, it will have been noted by the reader, was one condemning only the vessel (claimed by Haigh), and the munitions of war, &c. (claimed by Captain Blakely)—judgment as to the residue of the cargo having been reserved,—a decree was passed by the District Court, condemning this whole residue also.—See 23 Legal Intelligencer, 116.]

## NOTE.

Along with the preceding case was submitted another, much like it, the case of—