PEARSON et al. v. PARSON et al.

(Circuit Court, E. D. Louisiana. April 13, 1901.)

No. 12,942.

EQUITY JURISDICTION—POLITICAL QUESTIONS—ENJOINING VIOLATION OF NEU-
TRALITY RIGHTS.

A court of equity cannot take cognizance of a suit by private persons to
enjoin the shipment from a port of the United States of alleged military
supplies and munitions of war destined for the use of one of two foreign
nations which are engaged in a war, on the ground that, if the shipments
are permitted to be made, the war, which would otherwise cease, will be
continued, and property owned by complainants in the country of the
other belligerent will be destroyed, and that such shipments are in viola-
tion of the principles declared in an international treaty to which the
United States was a party, but the countries in which complainants' prop-
erty is situated were not. The questions involved in such case are en-
tirely political, and, in the very nature of things, the case is one which
can be dealt with only by the executive branch of the government.

## In Equity. On motion for preliminary injunction.

The complainants are Samuel Pearson, a citizen of the South African Re-
public, Edward Van Ness, a citizen of the state of New York, and Charles D.
Pierce, consul general of the Orange Free State, whose citizenship is not
set forth. In their original bill herein they aver, in substance: That the
United States are at peace with the South African Republic and the Orange
Free State, and that Great Britain is at war with the same. That complain-
ants are owners of property situated in the South African Republic and the
Orange Free State. That Great Britain, by means of armies, seeks to destroy,
and is now destroying, the property of complainants. That, for the purpose
of carrying on the war, the steamship Anglo-Australian, of which J. Parson is
master, now lies in the port of New Orleans, and is being loaded with 1,200
mules, worth $150,000, by Parson, and by Elder, Dempster & Co., who are the
agents for the ship, her owners and charterers, and who are represented by
Robert Warriner and Mathew Warriner. All of the defendants are averred
to be British subjects. That the steamship Anglo-Australian is employed in
the war in the military service of Great Britain by her owners and charterers
and by the defendants. That for some time past the defendants, in aid of the
war, have loaded ships at New Orleans with munitions of war, viz. mules and
horses, and have equipped ships with fittings for the purpose of carrying mili-
tary supplies and munitions of war for Great Britain, and have dispatched the
ships, well knowing that the munitions of war and the ships are in the mili-
tary service of Great Britain, and would be employed in the war. That the
steamship Anglo-Australian is about to be dispatched by the defendants, loaded
with mules and horses, being munitions of war, which are the property of the
government of Great Britain, and the same are to be employed in the military
service of Great Britain. That the defendants are making the port of New
Orleans the basis of military operations in aid of Great Britain in the war, and
are using the port for the purpose of renewal and augmentation of the mili-
tary supplies and arms of Great Britain in the war. That the defendants
have caused and are causing complainants irreparable injury, in that their
acts enable Great Britain to carry on the war with the South African Republic
and Orange Free State, wherein are found the property of complainants, and
that the army of Great Britain is enabled, by the means furnished by the
defendants, to lay waste and destroy the farms and homes of complainants,
and to hold as prisoners of war the wife and children of the complainant
Pearson. That the complainant Pearson has already suffered loss of prop-
erty to the amount of $90,000, and is now threatened with further loss of
$100,000, by the acts complained of and the continuation of the war. That
the war is only carried on by the renewal and augmentation of the military
supplies of Great Britain from the ports of the United States and especially

the port of New Orleans, and that when this ceases the war will end. That the defendants have conspired with certain agents and servants of Great Britain, whose names are unknown, to aid in the carrying on of the war, in the renewal and augmentation of the supplies of Great Britain, and in the equipping with munitions of war and the dispatching of the ship Anglo-Australian and other vessels for the purpose of slaying the citizens of the South African Republic and the Orange Free State, and destroying their property, and more particularly to injure and destroy the property and rights of complainants, all in violation of and against the rights, privileges, and immunities granted and secured to complainants by the law of nations and the constitution and laws of the United States. The prayer of the original bill is, in substance, for an injunction prohibiting the defendants, their agents, servants, etc., from loading on the ship Anglo-Australian, or other vessels, munitions of war, viz. mules and horses destined for use by Great Britain in the war. A restraining order or temporary injunction in advance of a final injunction is also prayed for. By an amended and supplemental bill, the original complainants seek to also enjoin a shipment of mules and horses by the steamship Monterey, now in the port of New Orleans, under all the conditions and circumstances alleged in the original bill respecting the ship Anglo-Australian. The parties defendant in the amended and supplemental bill are the defendants to the original bill, and, in addition, Capt. Markham and Capt. Marshall, whose citizenship is averred to be unknown; the Anglo-American Steamship Company, whose citizenship is not averred, represented by Robert and Mathew Warriner, averred in the original bill to be British subjects; H. Parry, master of the steamship Monterey, whose citizenship is averred to be unknown; and William J. Hannon and Joseph J. Beranger, citizens of the state of Louisiana. The purpose intended to be subserved by the amended and supplemental bill seems to be to enjoin the shipment of mules and horses by the steamship Monterey, and to charge that Capt. Markham, Capt. Marshall, Hannon, and Beranger were among those who confederated and conspired with the defendants named in the original bill to do the acts therein complained of.

Clegg & Quintero, for complainants.
H. P. Dart, for defendants.

PARLANGE, District Judge (after stating the facts). It was conceded on the argument that the court has no jurisdiction of this cause ratione personarum. The complainants sought to maintain the jurisdiction ratione materiæ by a claim of right under the treaty of Washington of May 8, 1871, between Great Britain and the United States relative to the "Alabame claims," in which treaty it is declared that:

"A neutral government is bound  *  *  *  not to permit or suffer either belligerent to make use of its ports or waters as the base of naval operations against the other, or for the purpose of the renewal or augmentation of military supplies or arms, or the recruitment of men."

The complainants contend that, by reason of this declaration of the treaty, they are entitled to invoke the equity powers of this court for the protection of their property. If the complainants could be heard to assert here rights personal to themselves in the treaty just mentioned, and if the mules and horses involved in this cause are munitions of war, all of which is disputed by the defendants, it would become necessary to determine whether the United States intended by the above declaration of the treaty to subvert the well-established principle of international law that the private citizens of a neutral nation can lawfully sell supplies to belligerents. It is almost impossible to suppose, a priori, that the United States would have done so,

and would have thus provided for the most serious and extensive derangement of and injury to the commerce of our citizens whenever two or more foreign nations should go to war; and it would seem that there is nothing in the treaty, especially when its history and purposes are considered, which would warrant the belief that the United States insisted upon inserting therein a new principle of international law, from which the greatest damage might result to the commerce of this country, and which was absolutely different from and antagonistic to the rule and policy which the government of this country had theretofore strenuously and invariably followed. The principle that neutral citizens may lawfully sell to belligerents has long since been settled in this country by the highest judicial authority. In the case of The Sanctissima Trinidad, 7 Wheat. 340, 5 L. Ed. 454, Mr. Justice Story, as the organ of the supreme court, said:

"There is nothing in our laws or in the law of nations that forbids our citizens from sending armed vessels, as well as munitions of war, to foreign ports for sale. It is a commercial adventure which no nation is bound to prohibit, and which only exposes the persons engaged in it to the penalty of confiscation."

See, also, the case of The Bermuda, 3 Wall. 551, 18 L. Ed. 200.

16 Am. & Eng. Enc. Law (2d Ed.) p. 1161, verbis "International Law," citing cases in support of the text, says:

"A neutral nation is, in general, bound not to furnish munitions of war to a belligerent, but there is no obligation upon it to prevent its subjects from doing so: and neutral subjects may freely sell at home to a belligerent purchaser, or carry to a belligerent power, arms and munitions of war, subject only to the possibility of their seizure as contraband while in transit."

Numerous other authorities on this point could be cited, if it was not deemed entirely unnecessary to do so.

The principle has been adhered to by the executive department of the government from the time when Mr. Jefferson was secretary of state to the present day. Mr. Jefferson said in 1793:

"Our citizens have always been free to make, vend, and export arms. It is the constant occupation and livelihood of some of them. To suppress their callings—the only means, perhaps, of their subsistence—because a war exists in foreign and distant countries, in which we have no concern, would scarcely be expected. It would be hard in principle and impossible in practice. The law of nations, therefore, respecting the rights of those at peace, does not require from them such an internal derangement in their occupation."

To the same effect are numerous other expressions and declarations of the executive department of the government from the earliest period of the country to the present time. See 3 Whart. Int. Law Dig. par. 391, tit. "Munitions of War."

Affidavits in the cause purport to show that the vessels which make the exportations of mules and horses of which the bills complain are private merchant vessels; that they are commanded by their usual officers, appointed and paid by the owners; that they are manned by their usual private crews, which are also paid by the owners; that they are not equipped for war; that they are not in the military service of Great Britain, nor controlled by the naval authorities of that nation; that they carry the mules and horses as they would carry any other cargo; and that the mules and horses are to be landed, not on

the territory of the South African Republic or the Orange Free State, but in Cape Colony, which is territory belonging to Great Britain. If these affidavits set out the facts truly, it is difficult to see how a cause of complaint can arise. If a belligerent may come to this country and buy munitions of war, it seems clear that he may export them as freight in private merchant vessels of his own or any other nationality, as cargo could be exported by the general public.

Another consideration in this cause is whether the allegations of threatened injury to the property rights of the complainants would in any case warrant the interposition of a court of equity. The theory of the complainants is that, if the injunction issues in this cause, the war will cease, but that, if these horses and mules are allowed to go to South Africa, the war will be carried on, and one of the results of its further prosecution will be the destruction of the complainants' property in South Africa. It is not claimed, of course, that the horses and mules are to be used specially to destroy the property of the complainants. In such cases as the present one, where the aid of equity is invoked to protect property rights, the injury apprehended must be a clear and reasonable one, proximately resulting from the act sought to be enjoined. The injury apprehended by the complainants from the shipping of the mules and horses seems to be remote, indistinct, and entirely speculative. It seems clear that, even if this cause were within the cognizance of this court, there is herein no such connection of cause and effect between the shipment of the animals and the destruction of complainants' property as could sustain an averment of threatened irreparable injury, and that the averment that the war would cease if the shipments are stopped, which, in the nature of things, can only be an expression of opinion and hope concerning a matter hardly susceptible of proof, could not be made the basis for judicial action.

It may be well to notice that there is nothing in this cause upon which could be founded a charge that the neutrality statutes of the United States are being violated. A citation of authorities on this point is deemed unnecessary. While I apprehend fully that the complainants are not claiming through or because of the neutrality statutes, still it would seem that there exists at least a presumption that the United States have been careful to provide in those statutes for the punishment of every breach of neutrality recognized by this country.

But the nature of this cause is such that none of the considerations hereinabove set out need be decided, for the reason that a view of this case presents itself which is paramount to all its other aspects, and leads irresistibly to the conclusion that the rule nisi must be denied. That view is that the case is a political one, of which a court of equity can take no cognizance, and which, in the very nature of governmental things, must belong to the executive branch of the government. No precedent or authority has been cited to the court which, in its opinion, could even remotely sustain the cause of the complainants. No case has been cited, nor do I believe that any could have been cited, presenting issues similar to those of this cause. The three complainants are private citizens. It is true that the complainant Pierce avers

that he is consul general of the Orange Free State; but his demand is exclusively a personal one, and he must be deemed to be suing in his personal capacity. One of the complainants is an alien and a citizen of the Orange Free State. Only one of the complainants is alleged to be a citizen of the United States. They own property in the South African Republic and the Orange Free State, foreign countries now at war with Great Britain. They fear that the war, if continued, will result in the destruction of their property. They believe that, if the shipments of mules and horses from this port are stopped, the war will cease. They claim that, by virtue of a declaration of international law contained in an international treaty to which the foreign countries in which their property is situated were not parties, they have the personal right to enjoin the shipments for the purpose of stopping the war, and thus saving their property from the destruction which they apprehend will result to it from a continuation of the war. When complainants' cause is thus analyzed, and the nature of the alleged right under the treaty is considered, it is obvious that a court of equity cannot take cognizance of the cause. The main case relied on by the counsel for the complainants is the case of Emperor of Austria v. Day, 3 De Gex, F. & J. 217 (English Chancery Reports), in which the emperor of Austria sought and obtained an injunction to restrain the manufacture in England of a large quantity of notes purporting to be receivable as money in, and to be guarantied by, Hungary. That action was brought by the emperor of Austria as the sovereign and representative of his nation, and the case turned and was decided on considerations entirely different from, and in no manner resembling, those presented in this cause. It may be worth noticing that the counsel for the emperor of Austria freely conceded in the argument of the case that the exportation of munitions of war could not be enjoined. I am clearly of opinion that this cause is not within the cognizance of this court, and for that reason the rule nisi must be denied.

BOARMAN, District Judge, who sat in this cause with PAR-LANGE, District Judge, concurs in the opinion.